UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:

Karen D. Davis,  Case No. 06-43888
 Chapter 13
 Debtor.  Hon. Phillip J. Shefferly

_____/

**OPINION DENYING CONFIRMATION OF CHAPTER 13 PLAN**

Introduction

This Chapter 13 case involves an issue arising under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). The issue is whether the phrase "applicable commitment period" is a temporal requirement that defines how long a debtor's Chapter 13 plan must be, or simply a mathematical formula for determining the minimum amount that a debtor must pay to unsecured creditors under her plan in order to obtain a discharge without regard to the length of the plan. At a hearing held on August 8, 2006, the Court sustained the Trustee's objection to the Debtor's plan in this case, denied confirmation, and held that the term "applicable commitment period" defines the minimum length of a Chapter 13 plan rather than creates a formula to determine a minimum amount that a debtor must pay to unsecured creditors. This opinion supplements the Court's ruling made on the record in open Court on August 8, 2006.

Facts

On March 31, 2006, the Debtor filed this Chapter 13 case. On April 17, 2006, the Debtor filed her form B22C, entitled "Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income for Use in Chapter 13." Part II of the form is entitled "Calculation of § 1325(b)(4) Commitment Period." Lines 15 and 16 indicate that the Debtor's annualized current

income is greater than the median family income in Michigan for a family of the same household size. The Debtor checked a box in line 17 indicating that her "applicable commitment period is 5 years." Line 58 of the Debtor's form B22C shows that the Debtor has monthly disposable income under § 1325(b)(2) of negative $274.35. On April 17, 2006, the Debtor filed a Chapter 13 plan and the Trustee filed an objection to the plan. On July 17, 2006, the Debtor filed an amended Chapter 13 plan. The Debtor's amended plan provides that the Debtor will make bi-weekly payments of $325.22 for 36 months. The plan provides that general unsecured creditors will share in a "pot" of $2,200 or the plan will continue for the 36 month plan length, whichever offers the greater dividend to general unsecured creditors.

On July 25, 2006, the Court held a confirmation hearing. At the hearing, the Trustee asserted that § 1325(b)(4)(A) provides that an above median income debtor shall have an applicable commitment period of five years and, therefore, the Debtor's proposed plan length of 36 months does not comply with that section of the Bankruptcy Code. Further, the Trustee asserted at the hearing that under § 1325(b)(1)(B), the Debtor's plan cannot be confirmed because it does not provide that all of the Debtor's projected disposable income to be received in her applicable commitment period of 60 months will be applied to make payments to unsecured creditors under her plan. The Debtor responded by stating that "applicable commitment period" does not set a temporal requirement by imposing a minimum *length* of plan, but instead is only a "multiplicand" used in a formula devised by § 1325(b)(1)(B) to determine a minimum *amount* that a debtor must pay to unsecured creditors under a Chapter 13 plan and bears no relationship to the actual length of a Chapter 13 plan. In the context of this case, line 58 of the Debtor's form B22C shows negative monthly disposable income (i.e., less than zero). As a result, the Debtor argues that her plan length is entirely irrelevant, even

though 60 months is her applicable commitment period under § 1325(b)(4)(A), because her plan is proposing to pay an amount to unsecured creditors that is greater than zero and, as such, exceeds the amount of her projected disposable income to be received during her 60 month applicable commitment period. Because applicable commitment period is only a multiplicand, according to the Debtor, her plan does comply with § 1325(b)(1)(B) and § 1325(b)(4)(A) and should be confirmed.

At the conclusion of the July 25, 2006 hearing, the Debtor and the Trustee offered to brief the issue for the Court. The Court rescheduled the hearing to permit briefs to be filed and adjourned the confirmation hearing to August 8, 2006 at which time the Court denied confirmation based upon the Trustee's objection.

<u>Analysis</u>

Resolution of the issue before the Court under BAPCPA first requires some review of pre-BAPCPA law. There was no provision in the Bankruptcy Code pre-BAPCPA that stated that all Chapter 13 plans must run a minimum length of time during which payments must be made. Section 1322, entitled "Contents of plan," stated in § 1322(a)(1) that "[t]he plan shall [ ] provide for the submission of all or such portion of future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan . . . ." This provision, which is unchanged by BAPCPA, required that a plan have sufficient funding. In other words, a debtor must pay enough money into the plan to do all the things the debtor's plan proposes to do. Further, the funding necessary to accomplish this shall, according to § 1322(a)(1), be submitted out of a debtor's future earnings or other future income. This of course made sense because if a debtor already had sufficient funds to pay her debts, she would likely have no need for Chapter 13 relief. Therefore, without imposing any minimum time length, the statute obviously

contemplated payments by a Chapter 13 debtor over some period of time, in an amount sufficient to fund the plan. Indeed, only an individual with "regular income" is even eligible to be a Chapter 13 debtor under § 109(e). The legislative history of Chapter 13 further supports this conception of Chapter 13. The purpose of Chapter 13 is described in H.R. Rep. No. 95-595, at 118 (1977) as enabling a debtor to "develop and perform under a plan for the repayment of his debts over an extended period."

How long did this extended period have to be pre-BAPCPA? Section 1326(a)(1), entitled "Payments," required the debtor to "commence" making payments by a specified date, 30 days after filing the plan, but did not say how long the payments must continue. However, § 1322(d) placed an outside, maximum length of time for making plan payments. That section of the Code provided that a plan may not provide for payments for longer than three years unless the Court, for cause, approved a longer period, but the Court could not approve a period longer than five years. Those were the parameters under the Bankruptcy Code enacted in 1978: plan payments could extend anywhere from 30 days to five years. There was no minimum length required nor any minimum amount that must be dedicated to the plan other than the requirement under § 1325(a)(4) that the plan pay unsecured creditors at least as much as they would receive in a Chapter 7 liquidation. Because there was no required length of time for a debtor to make plan payments, Bankruptcy Courts for several years wrestled with whether a short plan by a debtor, say one year if that's all that was required to cure a debtor's mortgage and car loan arrearages, should be confirmed with little or no distribution to unsecured creditors even though the debtor had enough future earnings or income that would enable unsecured creditors to receive a substantial distribution if the debtor simply lengthened her plan payments by another year or two. Lacking any statutorily fixed criteria for the length of a

plan, many courts applied the "good faith" requirement of § 1325(a)(3) to require more of an effort ( i.e., a longer plan length) to repay the debtor's creditors.

In 1984, Congress amended the Bankruptcy Code by the Bankruptcy Amendments and Federal Judgeship Act of 1984. That act added § 1325(b) to the Code. This new section addressed the minimal length of the plan issue in part, by providing that if the trustee or an unsecured creditor objected to a plan, the plan could not be confirmed unless one of two circumstances occurred: either the plan distributed property having a value of not less than the full amount of the unsecured claims under § 1325(b)(1)(A), or the plan provided that all of the debtor's projected disposable income to be received in the three years after the first payment was due would be applied to the plan. In short, if the debtor's plan did not pay unsecured claims in full, then upon objection by an unsecured creditor or a trustee, the debtor would be required to continue to make plan payments in the future, out of the disposable income she projected to be received over the next three years. This became known as the "best efforts" test. Although not requiring a minimum length of a plan in all cases, it did require a debtor who was not paying unsecured claims in full to make her "best efforts" for three years, if the trustee or an unsecured creditor objected. If she did so, the debtor could still obtain a Chapter 13 discharge. The bargain was fair and it was easy to understand.

After that change was made in 1984, Bankruptcy Courts became accustomed to examining a debtor's income and expenses to determine what expenses are reasonable and necessary for the maintenance and support of the debtor and her dependents in order to ascertain a debtor's projected disposable income. The starting point, of course, was the debtor's schedules I and J which set forth the debtor's actual income and expenses on a monthly basis. This seemed to provide debtors, trustees, creditors and the courts with a workable framework for analysis to achieve a result

consistent with the purposes of Chapter 13: to facilitate voluntary repayment of debt by individuals with regular income, provide them with a discharge of debts if they completed their plan, and deliver to creditors a recovery at least as great as they would receive in a Chapter 7 liquidation, all without a forced liquidation of the debtor's assets.

BAPCPA changed much of that. BAPCPA does not contain a provision that specifically states a minimum plan length for all plans. However, it does alter a number of the provisions discussed above that together imposed a three year best efforts disposable income test upon debtors who did not pay unsecured claims in full. First, BAPCPA redefines "disposable income" in § 1325(b)(2) by reference to BAPCPA's cornerstone, the formulaic Chapter 7 means test. New § 1325(b)(2) builds the definition of disposable income upon a debtor's historical "current monthly income" as it is now defined in § 101(10A) of the Bankruptcy Code. Further, for above median income Chapter 13 debtors, such as the Debtor in this case, § 1325(b)(3) incorporates the determination of expenses under the Chapter 7 means test in § 707(b)(2)(A) and (B). In addition to importing the mathematic criteria for disposable income and reasonably necessary expenses from the Chapter 7 means test into Chapter 13, BAPCPA also altered § 1325(b)(1)(B) by deleting the reference to "three year period" and replacing it with "applicable commitment period." Further, although BAPCPA added many new definitions to § 101, applicable commitment period was not one of them. Instead, BAPCPA added new provision § 1325(b)(4). It provides as follows:

> For purposes of this subsection, the "applicable commitment period" --
> (A) subject to subparagraph (B), shall be –
>   (i) 3 years; or
>   (ii) not less than 5 years, if the current monthly income of the debtor and the
>     debtor's spouse combined, when multiplied by 12, is not less than –
>       (I) in the case of a debtor in a household of 1 person, the median family
>         income of the applicable State for 1 earner;

>                    (II) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest
>                    median family income of the applicable State for a family of the same number
>                    or fewer individuals; or
>                    (III) in the case of a debtor in a household exceeding 4 individuals, the highest
>                    median family income of the applicable State for a family of 4 or fewer
>                    individuals, plus $525 per month for each individual in excess of 4; and
>          (B) may be less than 3 or 5 years, whichever is applicable under subparagraph (A),
>          but only if the plan provides for payment in full of all allowed unsecured claims over
>          a shorter period.

Simply put, the applicable commitment period under § 1325(b)(4) for a below median income debtor is three years, and for an above median income debtor is five years, but may be shorter for either if the plan provides for payment in full of unsecured claims over a shorter period. By replacing "three year period" with "applicable commitment period" in § 1325(b)(1)(B) and by redefining "disposable income" in § 1325(b)(2) by reference to the newly enacted Chapter 7 means test, did Congress eliminate the minimum length of *time* that a debtor who pays less than the full amount of their unsecured claims will have to stay in a Chapter 13 plan and replace this requirement with an arithmetic formula to determine only a minimum *amount* that must be paid by that debtor to unsecured creditors? In this case, the Debtor states that she need not stay in her plan for her applicable commitment period of 60 months, but instead may "cash out" of her plan at any time in advance of that date so long as she has paid over to unsecured creditors an amount that is equal to or greater than what she has calculated to be her monetary obligation under BAPCPA's newly written § 1325(b)(1)(B). On the other hand, the Trustee insists that because the Debtor is an above median income debtor, and her applicable commitment period is therefore five years under § 1325(b)(4)(A), the Debtor is required to continue to make payments into her plan for a length of 60 months.

While there is no quarrel between the Debtor and the Trustee in this case over what the Debtor's applicable commitment period is (i.e., five years), their competing views over the meaning

-7-

of this requirement in the context of § 1325(b)(1)(B) were easily foreseen and have recently been the subject of a number of secondary sources. See, e.g., Alane A. Becket & Thomas A. Lee III, *Applicable Commitment Period: Time or Money?*, Am. Bankr. Inst. J., 16, 16, 44-45 (Mar. 2006) (succinctly setting forth the two sides of the issue, recognizing that both rely on the "plain language" of the statute). Bankruptcy Judge Keith M. Lundin, Middle District of Tennessee, in his authoritative Chapter 13 treatise, considers the disposable income test of § 1325(b)(1)(B) to be only a formula to determine the amount of a monetary obligation and not a requirement for a length of plan payments. See 5 Keith M. Lundin, *Chapter 13 Bankruptcy* §§ 493.1 and 500.1 (3d ed. 2000 & Supp. 2006). Henry E. Hildebrand, III, the standing Chapter 13 Trustee for the Middle District of Tennessee, who has also written extensively regarding Chapter 13 issues, is also of the belief that the disposable income test in § 1325(b)(1)(B) post-BAPCPA is now reduced to a formula for an amount to be paid rather than a minimal length of plan payments. See *Unintended Consequences: BAPCPA and New Disposable Income Test*, Am. Bankr. Inst. J., 14, 14, 54-55 (Mar. 2006).

Recently, there have been a few bankruptcy decisions that have addressed the issue before this Court. They are split. The following cases all reached the conclusion that applicable commitment period is temporal and controls the length of a debtor's plan under § 1325(b)(1)(B) and (4): In re Alexander, 344 B.R. 742 (Bankr. E.D. N.C. 2006); In re Dew, 344 B.R. 655 (Bankr. N.D. Ala. 2006); In re Gress, 344 B.R. 919 (Bankr. W.D. Mo. 2006); In re McGuire, 342 B.R. 608 (Bankr. W.D. Mo. 2006); In re Schanuth, 342 B.R. 601 (Bankr. W.D. Mo. 2006). The parties also provided the Court with a copy of an unpublished decision from the District of Utah Bankruptcy Court that held that the applicable commitment period is a multiplicand in a mathematic formula to determine an amount to be paid to unsecured creditors rather than a temporal requirement in the sense of

mandating the length of the plan. In re Fuger, No. 06-20801, slip op. (Bankr. Utah June 29, 2006).

In In re Schanuth, the court squarely addressed the issue now before this Court. It began by noting that BAPCPA replaced the fixed three year commitment in § 1325(b)(1)(B) with a new concept - the "applicable commitment period" as defined in § 1325(b)(4). Schanuth, 342 B.R. at 606. The court then framed the issue:

> On its face, BAPCPA's only apparent change to minimum plan length is the creation of a two-tiered system based on a debtor's income. But some bankruptcy commentators, as well as the Debtors and Trustee in this case, suggest that BAPCPA's revisions to § 1325(b)(1) and (4) may have opened the door to chapter 13 plans that run less than 3 (or 5) years. The theory posited is that ACP [applicable commitment period] is a multiplier rather than a time period, a "monetary" versus "temporal" requirement, if you will. Those who advance the "monetary" interpretation of ACP, suggest that the language in § 1325(b)(1)(B) requiring that "all of the debtor's projected disposable income *to be received in the applicable commitment period* . . . " be devoted to a plan contemplates the projection and calculation of a fixed sum based on a debtor's disposable income multiplied by the length of the ACP, which would be "3 years" (36 months) for below-median income debtors and "5 years" (60 months) for above-median income debtors. And that the applicable commitment "amount" (for lack of a better term) can supposedly be paid off in less than 36 (or 60) months without violating § 1325(b)(4)(B).

Id. (footnotes omitted). The Schanuth court rejected the monetary interpretation of ACP for three reasons.

> First and foremost, the plan language of § 1325(b)(1) and (4) supports a temporal interpretation of ACP. The term itself "applicable commitment period," uses a word with temporal meaning: "period" means a "chronological division." The length of that chronological division is described in temporal terms – 3 *years* or 5 *years*. And, perhaps most telling of all, §1325(b)(4)(B), the provision that specifically contemplates plans shorter than 3 or 5 years, uses the same temporal terms–a debtor's ACP "may be less than 3 or 5 *years* . . . but only if the plan provides for payment in full of all allowed unsecured claims over a shorter *period*." If Congress had intended for ACP to function as a multiplier, Congress surely could have described it as such; in fact, evidence of that ability is found earlier in the very same provision where the statute requires a 5-year ACP for a debtor whose current monthly income, "when multiplied by 12," is not less than the applicable median family income.

-9-

When a statute's language is plain, the sole function of the court is to enforce it according to its terms. Here, the Court finds that the plain language used to describe and define the scope of the commitment a debtor must make of disposable income in a chapter 13 plan clearly indicates that that commitment is temporal in nature.

Second, a monetary interpretation of ACP renders § 1325(b)(4)(B) awkward, if not meaningless. To wit, if ACP is a monetary concept, then § 1325(b)(4)(B) would ostensibly require a debtor to multiply his monthly disposable income times 36 or 60 unless multiplying by a lesser number results in full payment of the debtor's unsecured claims. In other words, for debtors whose disposable income times 36 equals more than the allowed unsecured claims, the ACP "amount" equals the amount of allowed unsecured claims. Under this interpretation of ACP, § 1325(b)(4)(B) doesn't really state anything more than that a debtor does not have to pay more than 100% on his unsecured claims.
. . .

Finally, as a practical matter, a monetary interpretation of ACP represents a gross departure from pre-BAPCPA practice that is not justified by the language or structure of the statute. Prior to BAPCPA's enactment, debtors could not exit chapter 13 in less than three years without paying in full the allowed unsecured claims. BAPCPA's revision of § 1325, albeit significant, has not changed this tenet of pre-BAPCPA practice. Quite simply, the plain language of § 1325 dealing with applicable commitment period indicates that plan duration is still determined by temporal, not monetary, requirements. And the Court declines to abandon the temporal framework for determining plan duration without clear instructions from Congress to do so.

Id. at 606-08 (footnotes and citations omitted).

This Court is persuaded by the Schanuth court's analysis. However, in addition to the reasons cited by the Schanuth court, there are other reasons that militate in favor of construing the applicable commitment period to be a temporal requirement that defines the *length* of a plan rather than simply a formula to determine an *amount* to be paid under a plan. First, the Schanuth court looked at the term "period" and its definition as a "chronological division." Id. at 607. Webster's Dictionary also refers to it as a "portion of time" or a "length of existence." *Webster's Third New International Dictionary* at 1680 (2002). Similarly, the word "commitment" is defined in Webster's as "the act of

-10-

doing or performing something" and is also defined as "the obligation or pledge to carry out some action." Id. at 457. The terms "commitment" and "period" are therefore terms that by their ordinary, everyday meaning contemplate or suggest action by the debtor over a period of time. They connote an obligation to do something over a period of time. They do not on their face connote a formula to arrive at a value or an amount, at least not in their ordinary everyday meaning.

Second, although the Debtor asserts that the applicable commitment period is simply a multiplicand as used in § 1325(b)(1)(B) for purpose of creating a mathematic formula, this choice of verbiage is inconsistent with how Congress chose to articulate other requirements in BAPCPA that are expressly based upon multiplicands. For example, in § 707(b)(2)(A)(i), the essence of the means test is captured by a mathematical computation that requires current monthly income to be "reduced by the amounts determined under clauses (ii)(iii) and (iv), and multiplied by 60." When Congress intended to create a multiplicand, it used the word "multiply." The mandate in § 707(b)(2)(A)(i) is clear: current monthly income, reduced by specified amounts, must then be "multiplied by 60." Further, to ascertain whether a debtor's reasonably necessary expenses are determined by § 707(b)(2)(A) and (B), for the purpose of calculating that debtor's disposable income, § 1325(b)(3) directs that monthly income be "multiplied by 12." Similarly, to determine whether a debtor's applicable commitment period is three or five years under § 1325(b)(4) expressly requires income to be "multiplied" under that section. In short, where Congress commanded a calculation to be performed to arrive at an amount, it said so, loudly, and by using the word "multiply." On the other hand, § 1325(b)(1)(B) contains no reference to the word "multiply," but instead uses terms that in their ordinary, everyday meaning require a debtor to do something over a period of time. It does not say that a debtor's plan must pay an *amount* to unsecured creditors equal to the debtor's projected

-11-

disposable income *to be received* in the applicable commitment period. Instead, it provides that all of the debtor's projected disposable income to be received in the applicable commitment period "will be applied to make payments to unsecured creditors under the plan." These words connote the ongoing performance of an act, for the duration of the debtor's applicable commitment period, not the calculation of an *amount* that somehow equals the value of the debtor's performance over the life of her applicable commitment period. If Congress intended § 1325(b)(1)(B) to simply consist of the computation of the amount of a monetary obligation based upon a multiplication task, there are more plain and direct terms that could have been used, and that were used in other portions of BAPCPA.

Third, as noted in Schanuth, to convert the disposable income test from the temporal requirement of plan length that clearly existed pre-BAPCPA under § 1325(b)(1)(B), which imposed a minimum of three year period for a debtor to make her best efforts, into a monetary formula that has no minimal length of plan, would constitute a significant departure from pre-BAPCPA law. There is absolutely nothing in the legislative history to BAPCPA, scant as it is, to suggest that Congress intended this departure. What little legislative history does exist strongly suggests that Congress intended the applicable commitment period to impose a minimum length of a plan, not a multiplicand as Debtor asserts, as the following House Report shows:

> **"Sec. 318.** Chapter 13 Plans to Have a Five-Year Duration in Certain Cases. Paragraph (1) of § 318 of the Act amends Bankruptcy Code §§ 1322(d) and 1325(b) to specify that a chapter 13 plan may not provide for payments over a period that is not less than five years if the current monthly income of the debtor and the debtor's spouse combined exceeds certain monetary thresholds. If the current monthly income of the debtor and the debtor's spouse fall below these thresholds, then the duration of the plan may not be longer than three years unless the court, for cause, approves a longer period up to five years. The applicable commitment period may be less if the plan provides for payment in full of all allowed unsecured claims over a shorter period. Section 318(2), (3) and (4) make conforming amendments to §§ 1325(b) and 1329(c) of the Code."

-12-

Alane A. Becket & Thomas A. Lee III, *Applicable Commitment Period: Time or Money?*, Am. Bankr. Inst. J., 16, 16, (Mar. 2006) (quoting H.R. Rep. No. 109-31(l), April 8, 2005). The very title to this section suggests that the amendment to § 1325(b) was intended to govern a plan's duration rather than create a multiplicand for a mathematical computation.

Fourth, on a very practical level, if the Debtor's position is adopted, it essentially allows an individual in a Chapter 13 to retain her assets, yet have the right to "cash out" her unsecured creditors at a discount at any time post-confirmation and exit Chapter 13 by paying this pre-determined, discounted amount to unsecured creditors in exchange for a Chapter 13 discharge (which is broader than a Chapter 7 discharge), at such time as a debtor herself determines. If the ostensible purpose of the means test was to direct more Chapter 7 debtors into Chapter 13 to facilitate voluntary repayment to unsecured creditors, it seems unlikely that Congress would have so changed Chapter 13 as to now allow a debtor to pay a pre-determined discount price (which in many cases will be zero) to her unsecured creditors as and when the debtor chooses, and exit Chapter 13 without either having an ongoing commitment to make her best efforts over some required period of time to repay her creditors, or having ever subjected her assets to be administered for the benefit of those creditors by a trustee, as would occur in a Chapter 7 case.

Fifth, adopting the Debtor's view of applicable commitment period and using it only as a multiplicand that the Debtor can cash out whenever she is able and willing (or, more precisely, when she has cured the arrearages on her secured debts), is inconsistent with some of the other changes worked by BAPCPA regarding a debtor's ongoing financial reporting. For example, BAPCPA imposes new requirements on a debtor to submit annual tax returns post-petition to a Chapter 13 trustee or any party in interest who requests such returns under § 521(f). If the Debtor is correct in

asserting that there is no minimum length of time for any debtor's Chapter 13 plan, and that the applicable commitment period is simply a multiplicand in a formula to determine an amount that must be paid under § 1325(b)(1), no purpose is served by creating a continuing requirement for a debtor to turn over to a Chapter 13 trustee and to creditors post-confirmation annual tax returns. If a debtor can simply cash out of her plan by paying a pre-determined monetary amount under the formula suggested by the debtor, then a trustee and creditors would have no use for post-confirmation tax returns. Similar new post-confirmation reporting requirements have also been added by BAPCPA to § 521(a)(1)(B)(vi). That section requires a debtor to submit a statement disclosing any reasonably anticipated increase in income or expenditures over the 12 month period following the date of the petition. If a debtor's only responsibility is to pay the amount determined by an arithmetic formula under § 1325(b)(1)(B) based upon the debtor's current monthly income and her disposable income as calculated by that section of the Bankruptcy Code on the confirmation date, then what purpose is served by requiring that debtor to also disclose any reasonably anticipated increase in income or expenditures in the 12 months following the period of the debtor's petition? Trustees and creditors would have no ability to capture any increase in income post-petition upon its realization by a debtor if the debtor could simply cash out of her plan under § 1325(b)(1)(B) and exit Chapter 13 by paying the amount driven by the formula.

## Conclusion

Whatever perceived value may exist in BAPCPA's adoption of a rigid formula means test to determine eligibility for an individual to file Chapter 7, its partial importation into Chapter 13 fits about as well as a square peg in a round hole. It will undoubtedly effectuate changes, some unintended, in Chapter 13 practice and in the requirements for confirmation of a Chapter 13 plan.

-14-

However, the Court is not persuaded that one of these changes is the elimination of a minimum length of plan payments for a debtor who does not pay unsecured creditors in full. In this Court's view, a debtor's applicable commitment period, as determined by § 1325(b)(4), does impose a minimum *length* of plan, rather than a calculation of a minimum *amount*, by application of § 1325(b)(1)(B) to debtors whose Chapter 13 plans do not pay unsecured creditors in full and whose plans are the subject of an objection by a trustee or an unsecured creditor. For these reasons, the Trustee's objection is sustained and confirmation of the Debtor's plan is denied.

**For Publication**

**Entered: August 21, 2006**

                                            **/s/ Phillip J. Shefferly**
                                            **Phillip J. Shefferly**
                                            **United States Bankruptcy Judge**